Slip Op. 10-99

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| PAKFOOD PUBLIC COMPANY LIMITED, *et al.*,<br><br>　　　　　　　　Plaintiffs,<br><br>　　　- v -<br><br>THE UNITED STATES, *et al.*,<br><br>　　　　　　　　Defendants. | Before: Pogue, Judge<br><br>Consol. Court No. 09-00430 |

OPINION

[Granting in part and denying in part Plaintiffs' Motions for Judgment on the Agency Record, and remanding in part to Department of Commerce]

Dated: September 1, 2010

Trade Pacific PLLC (Robert G. Gosselink and Jonathan M. Freed) for Plaintiffs and Defendant-Intervenors Pakfood Public Co., Ltd.; Asia Pacific (Thailand) Co., Ltd.; Chaophraya Cold Storage Co., Ltd.; Okeanos Co., Ltd.; Okeanos Food Co., Ltd.; and Takzin Samut Co., Ltd.

White & Case LLP (Walter J. Spak and Jay C. Campbell) for Consolidated Plaintiffs and Defendant-Intervenors Andaman Seafood Co., Ltd.; Chanthaburi Frozen Food Co., Ltd.; Chanthaburi Seafoods Co., Ltd.; Phatthana Seafood Co., Ltd.; Phatthana Frozen Food Co., Ltd.; Thailand Fishery Cold Storage Public Co., Ltd.; Thai International Seafoods Co., Ltd.; Sea Wealth Frozen Food Co., Ltd.; and Rubicon Resources, LLC.

Akin Gump Strauss Hauer & Feld LLP (Warren E. Connelly and Jarrod M. Goldfeder) for Consolidated Plaintiffs and Defendant-Intervenors Thai Union Frozen Products Public Co., Ltd. and Thai Union Seafood Co., Ltd.

Picard Kentz & Rowe LLP (Andrew W. Kentz and Nathaniel J. Maandig Rickard) for Consolidated Plaintiff and Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee.

Stewart and Stewart (Geert M. De Prest and Elizabeth J.

<u>Drake</u>) and <u>Leake & Andersson, LLP</u> (<u>Edward T. Hayes</u>) for
Consolidated Plaintiff-Intervenor and Defendant-Intervenor The
Domestic Processors.

   <u>Tony West</u>, Assitant Attorney General; <u>Jeanne E. Davidson</u>,
Director; <u>Patricia M. McCarthy</u>, Assistant Director, Commercial
Litigation Branch, Civil Division, United States Department of
Justice (<u>Stephen C. Tosini</u>), and, of counsel, <u>Jonathan M.
Zielinski</u>, Attorney, Office of the Chief Counsel for Import
Administration, Department of Commerce, for Defendant United
States.

   **Pogue, Judge:**  This consolidated action[1] challenges four

determinations made by the United States Department of Commerce

("Commerce" or the "Department") in the final results of the

third administrative review of an antidumping ("AD") duty order

on frozen warmwater shrimp from Thailand.[2]  Two of the four

challenges come from Plaintiff Ad Hoc Shrimp Trade Action

Committee ("AHSTAC"), and two come from the two mandatory

respondents selected by the Department for individual examination

in this review, the "Rubicon Group"[3] and "Pakfood"[4] (collectively

---

   [1] The actions consolidated herein include Court Nos. 09-
00443, 09-00445, and 09-00447.

   [2] <u>See</u> <u>Certain Frozen Warmwater Shrimp from Thailand</u>, 74 Fed.
Reg. 47,551 (Dep't Commerce Sept. 16, 2009) (final results and
partial rescission of AD duty administrative review) ("<u>Final
Results</u>") and accompanying Issues & Decision Mem., A-549-822, ARP
07-08 (Sept. 8, 2009), Admin. R. Pub. Doc. 281 ("<u>I & D Mem.</u>").
The period of review ("POR") was February 1, 2007 through January
31, 2008. <u>Final Results</u>, 74 Fed. Reg. at 47,552.

   [3] Throughout the remainder of this opinion, the "Rubicon
Group" or "Rubicon" refers to Andaman Seafood Co., Ltd.
("Andaman"), Wales & Co. Universe Ltd., Chanthaburi Frozen Food
Co., Ltd. ("CFF"), Chanthaburi Seafoods Co., Ltd. ("CSF"),
                                                  (continued...)

the "Respondent Plaintiffs"[5]).

Plaintiff AHSTAC contests: (I) the Department's exclusive reliance on "type 3" entry data[6] obtained from United States Customs and Border Protection ("CBP entry data") in selecting respondents for individual examination in this review; and (II) Commerce's determination – underlying the agency's grant of a constructed export price ("CEP") offset to Rubicon's normal value ("NV") – that the level of trade ("LOT") of Rubicon's CEP sales

_____

[3](...continued)
Intersia Foods Co., Ltd. (formerly Y2K Frozen Foods Co., Ltd.), Phattana Seafood Co., Ltd. ("PTN"), Phattana Frozen Food Co., Ltd. ("PFF"), S.C.C. Frozen Seafood Co., Ltd., Thailand Fishery Cold Storage Public Co., Ltd. ("TFC"), Thai International Seafoods Co., Ltd. ("TIS"), and Sea Wealth Frozen Food Co., Ltd. ("Sea Wealth"). Final Results, 74 Fed. Reg. at 47,551. The group consists of affiliated firms, collapsed for AD analysis pursuant to 19 C.F.R. § 351.401(f) (2009).

[4] Throughout the remainder of this opinion, "Pakfood" refers to Plaintiffs Pakfood Public Co., Ltd. and its subsidiaries, Asia Pacific (Thailand) Co., Ltd., Chaophraya Cold Storage Co., Ltd., Okeanos Co., Ltd., Okeanos Food Co., Ltd., and Takzin Samut Co., Ltd. Final Results, 74 Fed. Reg. at 47,551. Like Rubicon, this group consists of affiliated firms, collapsed for AD analysis pursuant to 19 C.F.R. § 351.401(f).

[5] The following entities were included within the Rubicon Group in this review but are not named Plaintiffs in this action: Wales & Co. Universe Ltd.; Intersia Foods Co., Ltd.; and S.C.C. Frozen Seafood Co., Ltd. Final Results, 74 Fed. Reg. at 47,551. (See Compl., Andaman Seafood Co. v. United States, No. 09-00047 (Nov. 9, 2009).) Plaintiff Rubicon Resources, LLC, is the Rubicon Group's U.S. affiliate, and is included within all references to the "Respondent Plaintiffs" throughout the remainder of this opinion.

[6] Type 3 refers to consumption entries of merchandise subject to AD duties.

was less advanced than the LOT of its NV sales.  The Respondent Plaintiffs in turn contest: (III) Commerce's refusal to accept Pakfood's contractual exchange rate data after the expiration of the Department's party-initiated submission deadline; and (IV) the Department's refusal to offset interest earned on long-term deposits, used to secure access to lines of credit, against the costs of production and constructed value of two of Rubicon's affiliates.

The court has jurisdiction over this matter pursuant to Section 516A(a)(2) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2) (2006)[7] and 28 U.S.C. § 1581(c).

As explained more fully below, the court concludes that (I) because the Department, without adequate explanation, treated this case materially differently from similarly situated proceedings, Commerce's exclusive reliance on CBP entry data in selecting the mandatory respondents for this review was arbitrary and not in accordance with law; (II) Commerce did not arbitrarily deviate from precedent in determining, on the record of this review, that the LOT of Rubicon's CEP sales was less advanced than the LOT of its NV sales, and the agency's LOT determination was supported by substantial evidence on the record of this review; (III) because Pakfood failed to exhaust its

---

[7] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2006 edition.

administrative remedies with respect to the issue of its

contractual exchange rates, Pakfood failed to preserve this issue

for review; and (IV) Commerce acted in accordance with its

established practice in denying an interest offset to Rubicon for

interest earned on long-term deposits, and the Department's

determination to deny the offset was supported by substantial

evidence.

Accordingly, the court remands to Commerce solely on the

issue of the agency's methodology for selecting mandatory

respondents in this review, and Plaintiffs' requests for judgment

on the agency record with regard to the remaining three

challenges at issue here are each denied.[8]

---

[8] In the interest of judicial economy, and despite the
court's conclusion that a remand is necessary on the issue of
Commerce's methodology for choosing mandatory respondents in this
review, the court will nevertheless consider each of Plaintiffs'
remaining challenges to Commerce's treatment of the mandatory
respondents in this review, because the Respondent Plaintiffs
will likely remain mandatory respondents regardless of whether or
not the Department continues on remand to rely exclusively on CBP
entry data in supporting its choices. See Certain Frozen
Warmwater Shrimp from Thailand, 73 Fed. Reg. 12,088, 12,089
(Dep't Commerce Mar. 6, 2008) (preliminary results and
preliminary partial rescission of AD duty administrative review)
("*Based upon our consideration of the responses to the Q&V
questionnaire* received and the resources available to the
Department, we determined that it was not practicable to examine
all exporters/producers of subject merchandise for which a review
was requested.  As a result, . . . *we selected the four largest
producers/exporters* of certain frozen warmwater shrimp from
Thailand during the POR, *[including] Pakfood, [and] the Rubicon
Group*, . . . as the mandatory respondents in this proceeding."
(emphasis added)) (unchanged in final results, see Certain Frozen
(continued...)

## STANDARD OF REVIEW

Where, as here, an action is brought under 19 U.S.C. § 1516a(a)(2) (providing a cause of action for, *inter alia*, challenges to final determinations by Commerce in administrative reviews of AD duty orders), "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938); Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (same).

A determination, finding, or conclusion is not in accordance with law if, *inter alia*, it is arbitrary. See SKF USA Inc. v. United States, 263 F.3d 1369, 1378, 1382 (Fed. Cir. 2001) (reviewing a challenge brought under 19 U.S.C. § 1516a(a)(2) and

---

[8](...continued)
Warmwater Shrimp from Thailand, 73 Fed. Reg. 50,933, 50,934, 50,937 (Dep't Commerce Aug. 29, 2008) (final results and final partial rescission of AD duty administrative review)).  In addition, the court notes that the question of the Department's exclusive reliance on CBP data in selecting mandatory respondents for this review remains live even if the use of a different methodology would not alter the results of the selection process. As explained below, the use of CBP data may affect determinations of affiliation, and hence also the composition of the set of companies assigned the mandatory respondents' AD duty rates.

holding Commerce's determination to be not in accordance with law under 19 U.S.C. 1516a(b)(1)(B)(i) because "it is well-established that an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently" (quotation and alteration marks and citation omitted)); Nat'l Fisheries Inst. v. United States, __ CIT __, 637 F. Supp. 2d 1270, 1282 (2009) (noting the court's holding that Commerce's decision was "arbitrary . . . and therefore contrary to law").

**DISCUSSION**

I.   Commerce's Use of CBP Entry Data to Select Mandatory
     Respondents in this Review

     *A.   Background*

     In its Notice of Initiation for the instant administrative review,[9] the Department announced that it would be exercising its discretion under 19 U.S.C. § 1677f-1(c)(2) to limit the number of respondents selected for individual investigation. See Notice of Initiation, 73 Fed. Reg. at 18,765.  Relying solely on CBP entry data, the Department identified Pakfood and Rubicon as the two largest producers/exporters of the subject merchandise, and accordingly selected these entities as mandatory respondents in this review. See id.; Certain Frozen Warmwater Shrimp from

---

[9] Certain Frozen Warmwater Shrimp from Brazil, Ecuador, India, and Thailand, 73 Fed. Reg. 18,754 (Dep't Commerce Apr. 7, 2008) (notice of initiation of AD reviews) ("Notice of Initiation").

Thailand, 74 Fed. Reg. 10,000, 10,001 (Dep't Commerce Mar. 9,

2009) ("Prelim. Results") (unchanged in final results, see Final

Results, 74 Fed. Reg. at 47,553); I & D Mem. Cmt. 2.

AHSTAC argues, *inter alia*, that Commerce's exclusive

reliance on CBP entry data in selecting the mandatory respondents

for this review was contrary to law because it is both

inconsistent with prior practice (i.e. arbitrary and

capricious[10]) and an abuse of discretion.[11] (See Mem. of Law in

Supp. of Pl. [AHSTAC]'s Rule 56.2 Mot. for J. on Agency R.

("AHSTAC's Br.") 13.)  In response, Commerce contends that it

reasonably relied on CBP entry data in selecting the largest

exporters/producers for individual examination, and that such

reliance is not arbitrary or capricious because, "although [the

Department] has relied upon [data from] quantity and value ["Q &

V"] questionnaires in certain proceedings, . . . Commerce's

---

[10] See Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003) (Commerce acts arbitrarily and capriciously when it "consistently follow[s] a contrary practice in similar circumstances and provide[s] no reasonable explanation for the change in practice").

[11] "Arbitrary, capricious, or an abuse of discretion review . . . is now routinely applied by the courts as one standard under the heading of 'arbitrary and capricious' review.  And it encompasses both review of the factual basis of an agency's action, and review of an agency's reasoning as distinguished from its factfinding." Eagle Broad. Grp. v. FCC, 563 F.3d 543, 551 (D.C. Cir. 2009) (internal quotation and alteration marks omitted) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971); Bownman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974)).

'current practice is to select respondents using CBP [entry]

data.'" (Def.'s Opp'n to Pls.' Mots. for J. Upon Admin. R.

("Def.'s Br.") 8 (quoting I & D Mem. Cmt. 2 at 9-10).)

> B.    *Commerce's Exclusive Reliance on CBP Entry Data to*
>        *Select Mandatory Respondents in this Review Was*
>        *Arbitrary and Therefore Not in Accordance with Law.*

Contrary to the Department's claims, Commerce does not

employ a consistent practice, supported with adequate reasoning,

for selecting mandatory respondents based on import volume,

pursuant to 19 U.S.C. § 1677f-1(c)(2).  While the Department has

used CBP entry data to select mandatory respondents in some

administrative reviews initiated prior to the review under

consideration here,[12] the Department has also continued the

---

[12] See, e.g., Wooden Bedroom Furniture from the People's Republic of China, 73 Fed. Reg. 12,392, 12,392 (Dep't Commerce Mar. 7, 2008) (notice of initiation of administrative review of the AD duty order) ("For this administrative review, the Department intends to select respondents based on [CBP entry] data for U.S. imports during the [POR].  . . .  The Department invites comments regarding the CBP [entry] data and the selection of respondents within seven days of the publication of this Federal Register notice.").  The Department has also used CBP entry data to select mandatory respondents in some investigations of sales at less than fair value ("LTFV") initiated prior to the AD proceeding at issue here. See, e.g., Lemon Juice from Argentina, 72 Fed. Reg. 20,820, 20,821 (Dep't Commerce Apr. 26, 2007) (preliminary determination of sales at LTFV and affirmative preliminary determination of critical circumstances) ("Based on our analysis of import data obtained from [CBP], we selected two producers/exporters . . . as the mandatory respondents in this investigation because they were the largest [] producers/ exporters of [subject merchandise].").  In other AD proceedings, the Department has also used a combination of CBP entry data and company-specific export data. See, e.g., Prestressed Concrete
(continued...)

practice of selecting mandatory respondents on the basis of Q & V

questionnaires.[13]  Without explanation, Commerce continues to use

---

[12](...continued)
<u>Steel Wire Strand from the Republic of Korea</u>, 68 Fed. Reg.
42,393, 42,394 (Dep't Commerce July 17, 2003) (notice of
preliminary determination of sales at LTFV) ("[B]ecause there
were numerous producers/exporters of subject merchandise during
the period of investigation (POI), we examined company-specific
export data and [CBP] import data for the POI and selected as
mandatory respondents the two companies that accounted for the
majority of subject imports from [the relevant countries].").

[13] <u>See</u> <u>Wooden Bedroom Furniture from the People's Republic
of China</u>, 74 Fed. Reg. 8,776, 8,777 (Dep't Commerce Feb. 26,
2009) (initiation of AD duty administrative review) ("In the
event that the Department limits the number of respondents for
individual examination in the administrative review of wooden
bedroom furniture, the Department intends to select respondents
based on information obtained from the companies requested for
review . . . .  Therefore, . . . we will be requiring all parties
for whom a review has been requested to respond to a Q&V
questionnaire.") (subsequently using Q & V questionnaires to
select mandatory respondents, 75 Fed. Reg. 5,952, 5,953 (Dep't
Commerce Feb. 5, 2010) (preliminary results of AD duty
administrative review and intent to rescind review in part)
("[U]sing Q&V data[,] the Department limited the number of
companies to be individually examined . . . ."));  <u>Polyethylene
Retail Carrier Bags from the People's Republic of China</u>, 73 Fed.
Reg. 52,282, 52,283 (Dep't Commerce Sept. 9, 2008) (preliminary
results of AD duty administrative review) ("Based upon responses
to the Q&V questionnaires, the Department selected [two
companies] for individual examination in this administrative
review . . . .").  <u>See also</u> <u>Certain Polyester Staple Fiber from
the People's Republic of China</u>, 74 Fed. Reg. 32,125, 32,125
(Dep't Commerce July 7, 2009) (preliminary results of AD duty
administrative review and extension of time limit for final
results) ("On October 1, 2008, the Department sent out a [Q & V]
questionnaire to all 27 companies for which a review was
requested because a significant amount of the volume in the CBP
[entry] data was unclear.").
       The Department has also used Q & V questionnaires in
combination with CBP entry data. <u>Wooden Bedroom Furniture from
the People's Republic of China</u>, 75 Fed. Reg. 9,869, 9,870 (Dep't
                                                    (continued...)

Q & V questionnaires in some administrative proceedings –
including reviews, such as the review under consideration in this
case, of AD duty orders with at least two prior completed
reviews[14] – and to use CBP entry data in others.

As AHSTAC correctly points out (AHSTAC's Br. 10), because
CBP entry data do not contain information with respect to company
affiliations, where the Department relies exclusively on such
data, it is forced to use affiliation-related information
obtained in the course of prior proceedings.[15]  Such affiliation-
related data may or may not remain accurate with regard the POR
at issue.  Unlike cases in which Commerce issues and verifies Q &
V questionnaires, when the Department uses CBP entry data to
select mandatory respondents, disclosure of accurate affiliation
information for the relevant POR becomes discretionary for the

_____

[13](...continued)
Commerce Mar. 4, 2010) (initiation of administrative review of
the AD duty order) ("[T]he Department has decided to send Q&V
questionnaires to the 20 companies for which reviews were
requested with the largest total values of subject merchandise
imported into the United States during the POR according to CBP
data.").

[14] See Wooden Bedroom Furniture from the People's Republic
of China, 74 Fed. Reg. at 8,777 (fourth review).

[15] See Mem. Re. Selection of Respondents for Individual
Review, A-549-822, ARP 07-08 (May 27, 2008), Admin. R. Pub.
Doc. 67, at 7 ("[W]e have developed considerable information
regarding the affiliations of the requested companies during the
previous segments . . .. [W]e will continue to treat any
affiliated companies found to be collapsible in previous segments
of the proceeding as a single entity in the current segment.").

producers/exporters.  To the extent that producers/exporters see benefit in correcting outdated information, they may do so; to the extent, however, that the producers/exporters do not view correction of outdated information as beneficial, the burden to discover and correct any inaccuracies now falls on petitioners who, unlike the producers/exporters, are not likely to be in possession of the relevant information.[16]  As a result, the domestic producers of some merchandise bear the burden of analyzing and correcting potentially outdated affiliation information (when CBP entry data are used) in administrative reviews of AD duty orders imposed on their foreign counterparts, whereas the domestic producers of other merchandise bear no similar burden (when Q & V questionnaires are issued and verified).[17]

---

[16] The Notice of Initiation gave interested parties ten days from the date of its publication to submit comments on the CBP entry data. Notice of Initiation, 73 Fed. Reg. at 18,766. Because the CBP entry data were not received by interested parties until after the Notice of Initiation was published, the parties were afforded less than one week to analyze and comment on any inaccuracies found in the CBP entry data. See Letter from Dewey & Le Boeuf, LLP, A-549-822, ARP 07-08 (Apr. 17, 2008), Admin. R. Pub. Doc. 44, at 10; see also Notice of Initiation, 73 Fed. Reg. at 18,765 ("We intend to release the CBP [entry] data . . . within five days of publication of this Federal Register notice . . . .").

[17] Compare, e.g., Lemon Juice from Argentina, 72 Fed. Reg. at 20,821 (use of CBP entry data to select mandatory respondents) with Wooden Bedroom Furniture from the People's Republic of China, 74 Fed. Reg. at 8,777 (use of Q & V questionnaires).

As mentioned above, where an agency is afforded a measure of discretion in administering a statute, the exercise of that discretion is not in accordance with law if it is arbitrary, such as where the agency treats like cases differently. See, e.g., Martin v. Franklin Capital Corp., 546 U.S. 132, 139 (2005) ("Discretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike." (citation omitted)); SKF, 263 F.3d at 1382 ("[I]t is well-established that an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." (quotation and alteration marks and citation omitted)).

By using CBP entry data in some reviews and Q & V questionnaires in others, Commerce is, without explanation, placing a higher burden on producers of some merchandise than on producers of other merchandise. Regardless of the reasonableness of using CBP entry data to select mandatory respondents, therefore, the Department's apparently arbitrary and inconsistent employment of this methodology is not, without more adequate explanation, consistent with basic principles of the rule of law. See, e.g., Green Country Mobilephone, Inc. v. FCC, 765 F.2d 235, 237 (D.C. Cir. 1985) ("We reverse the [agency] not because the strict rule it applied is inherently invalid, but rather because the [agency] has invoked the rule inconsistently. We find the

[agency] has not treated similar cases similarly."); <u>Nakornthai Strip Mill Pub. Co. v. United States</u>, __ CIT __, 587 F. Supp. 2d 1303, 1307 (2008) ("Agencies have a responsibility to administer their statutorily accorded powers fairly and rationally, which includes not treating similar situations in dissimilar ways." (quotation and alteration marks and citation omitted)).

The court accordingly concludes that a remand is necessary on the issue of the Department's methodology for selecting mandatory respondents in this review.  On remand, Commerce must either provide an adequately reasoned explanation distinguishing the present case from apparently similar cases in which the Department has employed and continues to employ a materially different methodology, or else apply a methodology consistent with those similarly situated cases.  The chosen methodology must comport with a reasonable interpretation of the AD statute.[18]

---

[18] Because neither the AD statute nor any of Commerce's regulations directly address the methodology by which the Department is to arrive at the number of "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined," 19 U.S.C. § 1677f-1(c)(2)(B), the court will uphold Commerce's methodology if it is reasonable, <u>see</u> <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 843 (1984), and is not arbitrarily applied. <u>See, e.g.</u>, <u>Caribbean Ispat Ltd. v. United States</u>, 450 F.3d 1336, 1340 (Fed. Cir. 2006) (denying <u>Chevron</u> deference where the statutory interpretation advanced by the agency "d[id] not represent the [agency]'s considered, consistent, or formal interpretation of [the statute]" and particularly where the agency, in a case similar to that under consideration, employed a methodology contrary to that being challenged). <u>See also</u> <u>Bowen v.</u>
(continued...)

II.  Commerce's Grant of a CEP Offset to the Rubicon Group

    *A.  Background*

An AD duty is based upon the difference between the NV, i.e., the price charged for the subject merchandise in its home or third country comparison market,[19] and the "export price" ("EP"), i.e., the price charged for such merchandise in the United States, or, where, as here, a foreign producer sells to an affiliated purchaser in the United States, the CEP. Micron Tech., Inc. v. United States, 243 F.3d 1301, 1303 (Fed. Cir. 2001).

To ensure a fair comparison of the NV to the appropriate U.S. price, Commerce is required to establish the NV "to the extent practicable, at the same [LOT] as the [EP] or [CEP]."

-----

[18](...continued)
Georgetown Univ. Hosp., 488 U.S. 204, 212 (1988) ("We have never applied [Chevron deference] to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.").

[19] A third country market price will be the basis for the NV in a dumping margin calculation when Commerce determines that "the aggregate quantity (or, if quantity is not appropriate, value) of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject merchandise to the United States." 19 U.S.C. § 1677b(a)(1)(C)(ii).  In this case, because the Rubicon Group's aggregate volume of home market sales of the foreign like products of the subject merchandise was insufficient to permit a proper comparison with the U.S. CEP sales, the Department used the Rubicon Group's sales to Canada, its largest third-country market, as the basis for comparison-market sales, in accordance with 19 U.S.C. § 1667b(a)(1)(C) and 19 C.F.R. § 351.404. See Prelim. Results, 74 Fed. Reg. at 10,003.

19 U.S.C. § 1677b(a)(1)(B)(i).[20]  While the phrase "same [LOT]" is left undefined by both the statute and the Statement of Administrative Action ("SAA"),[21] the Department's regulations provide that "sales are made at different [LOTs] if they are made at different marketing stages (or their equivalent)." 19 C.F.R. § 351.412(c)(2).[22]

In determining whether sales are made at different LOTs in the U.S. and comparison markets, the Department "analyze[s] [the exporter/producer's] selling functions to determine if [LOTs] identified by a party are meaningful[;] [i]n situations where some differences in selling activities are associated with different sales, whether that difference amounts to a difference in the [LOTs] [is] evaluated in the context of the seller's whole scheme of marketing." Antidumping Duties; Countervailing Duties,

---

[20] See also Micron, 243 F.3d at 1313 ("[T]he overarching purpose of the [AD] statute is to permit a 'fair, 'apples-to-apples' comparison between foreign market value and United States price . . . .'" (quoting Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995))); 19 U.S.C. § 1677b(a) ("[A] fair comparison shall be made between the [EP] or [CEP] and [NV].").

[21] See generally 19 U.S.C. §§ 1677, 1677b(a)(1)(B); SAA, H.R. Doc. No. 103-316, 103d Cong., 2d Sess. (1994), reprinted in 1994 U.S.C.C.A.N. 4040. Accord Micron, 243 F.3d at 1305.

[22] See also Micron, 243 F.3d at 1305 ("[W]e understand the term ['same LOT'] to mean comparable marketing stages in the home and United States markets . . . . [Requiring comparison of CEP and NV to be, to the extent practicable, at the same LOT] ensures, for example, that a [NV] wholesale price will not be compared to a United States CEP retail price."); Prelim. Results, 74 Fed. Reg. at 10,003 (relying on 19 C.F.R. § 351.412(c)(2)).

62 Fed. Reg. 27,296, 27,371 (Dep't Commerce May 19, 1997) (final

rule).  "Each more remote [LOT] must be characterized by an

additional layer of selling activities, amounting in the

aggregate to a substantially different selling function." Id.

Accord Micron, 243 F.3d at 1314 (same). See also SAA at 829

(characterizing "difference in the [LOT]" as "a difference

between the actual functions performed by the sellers at the

different [LOTs] in the two markets," and noting that "Commerce

will require evidence from the foreign producers that the

functions performed by the sellers at the same [LOT] in the U.S.

and foreign markets are similar, and that different selling

activities are actually performed at the allegedly different

[LOTs]").

    If the Department determines that a respondent's NV and CEP

sales were at different LOTs, and if "the difference in [LOT]

. . . is demonstrated to affect price comparability, based on a

pattern of consistent price differences between sales at

different [LOTs] in the country in which [NV] is determined,"

19 U.S.C. § 1677b(a)(7)(A)(ii), the Department is required to

make an LOT adjustment to NV. Id.  However, where the record does

not contain data sufficient to make an LOT adjustment,[23] and

_____

        [23] See SAA at 830-31 ("In some circumstances, the data may
not permit Commerce to determine the amount of the [LOT]
adjustment.  For example, there may be no, or very few sales of a
                                                    (continued...)

where the NV is established at an LOT that is more remote from the factory than that of the CEP,[24] the Department may grant a capped CEP offset to NV pursuant to 19 U.S.C. § 1677b(a)(7)(B).[25]

---

[23](...continued)
sufficiently similar product by a seller to independent customers at different [LOTs].  This could be the case where there is only one foreign respondent and all sales are to affiliated purchasers.  Also, there could be restrictive business practices which result in too few appropriate sales to determine a price effect.  Similarly, the data could indicate a clearly contradictory result, for example contradictory patterns during different periods.  In such situations, although an adjustment might have been warranted, Commerce may be unable to determine whether there is an effect on price comparability.  In such situations, although there is a difference in [LOTs], Commerce may be unable to quantify the adjustment.  Where this occurs, Commerce will make a capped '[CEP] offset' adjustment under [19 U.S.C. § 1677b(a)(7)(B)], in lieu of the [LOT] adjustment that would be warranted under [19 U.S.C. § 1677b(a)(7)(A)].").

[24] See SAA at 831 ("The [CEP] offset adjustment will be made only where [NV] is established at a [LOT] more remote from the factory than the [LOT] of the [CEP]; i.e., where adjustment under [19 U.S.C. § 1677b(a)(7)(A)], if it could have been quantified, would likely have resulted in a reduction of the [NV].").

[25] See also 19 C.F.R. § 351.412(f)(3) ("Where available data permit [Commerce] to determine . . . whether the difference in [LOT] affects price comparability, [Commerce] will not grant a [CEP] offset.  In such cases, . . . [Commerce] will make a [LOT] adjustment."); Antidumping Duties; Countervailing Duties, 62 Fed. Reg. at 27,370 (noting that 19 C.F.R. § 351.412(f) "clarifies that the Department will grant a CEP offset only where a respondent has succeeded in establishing that there is a difference in the [LOTs], but, although the respondent has cooperated to the best of its ability, the available data do not permit the Department to determine whether that difference affects price comparability"); Micron, 243 F.3d at 1305 ("In some instances, the [LOT] in the home [or third country comparison] market will constitute a more advanced stage of distribution than the [LOT] in the United States, yet Commerce will lack sufficient data regarding the sales in the two markets to make a [LOT]
(continued...)

The grant of a CEP offset reduces the respondent's NV by the lesser of the indirect selling expenses ("ISEs") incurred on sales of the foreign like product in the country in which NV is determined or the expenses incurred on U.S. sales by the U.S. affiliate which are deducted from the CEP under 19 U.S.C. § 1677a(d)(1)(D). See 19 U.S.C. § 1677b(a)(7)(B); Micron, 243 F.3d at 1305 ("The effect [of a CEP offset] is to reduce the price of the more advanced [LOT] by 'indirect selling expenses' that have been included in the price on the apparent theory that such costs would not have been incurred if the sale had been made on a less advanced [LOT].  However, the 'CEP offset' may not exceed 'the amount of such expenses for which a deduction is made under section 1677a(d)(1)(D).'" (quoting 19 U.S.C. § 1677b(a)(7)(B))).[26]

---

[25](...continued)
adjustment, that is, it will be unable to determine how much to reduce the foreign sale price to arrive at a price comparable to the U.S. price.  In those cases, the statute provides for the award of a [CEP offset], i.e., a reduction in [NV] equal to 'the amount of indirect selling expenses incurred in the country in which [NV] is determined on sales of the foreign like product . . . .'" (quoting 19 U.S.C. § 1677b(a)(7)(B)).

[26] See also Micron, 243 F.3d at 1314 ("[T]he [LOT] comparison is to be made at the [LOT] that most nearly corresponds to EP – i.e., a sale to an unaffiliated importer and at the [LOT] which will be used in the duty calculation.  This is the [LOT] reflected in adjusted CEP.  Admittedly, Commerce's methodology results in comparison of adjusted CEP with unadjusted [NV].  However, [] the very purpose of the comparison is to determine whether an adjustment should be made to [NV].  That
(continued...)

In this case, "[i]n order to determine whether the comparison-market sales and CEP sales were made at different marketing stages, [Commerce] compared the various selling activities performed by [Rubicon] for sales to unaffiliated customers in Canada to the selling activities performed for [Rubicon]'s sales to [its] U.S. affiliate, Rubicon Resources." I & D Mem. Cmt. 8 at 27. "In contrast to the many selling activities performed by the [Rubicon Group] for sales to Canada, [the Department] confirmed at verification the limited selling functions that the [Rubicon Group] perform[ed] for sales to Rubicon Resources." Id. (citing Mem. to File, Verification of the Sales Responses of [CFF] and Rubicon Resources LLC [] in the [AD] Review of Certain Frozen Warmwater Shrimp from Thailand, A-549-822, ARP 07-08 (May 8, 2009), Admin. R. Pub. Doc. 252).

Specifically:

In comparing the Canadian LOT to the CEP LOT, [Commerce] found that the selling activities performed by the Thai packers[27] for CEP sales were significantly fewer than the selling activities that were performed for the Canadian sales. The Thai packers provided the following selling functions: sales forecasting; market research; sales promotion; advertising; trade shows; inventory maintenance; order input/processing; freight

---

[26](...continued) adjustment itself results in comparability.").

[27] The following companies in the Rubicon Group produced subject merchandise during the POR and are collectively referred to as the "Thai packers": Andaman, CSF, CFF, PTN, PFF, TFC, TIS, and Sea Wealth.

and delivery arrangements; visits, calls and
correspondence to customers; development of new
packaging and new markets (with customer); packing; and
after-sales services for Canadian sales.  The only
selling functions that the Thai packers provided for
CEP sales were inventory maintenance, order
input/processing, freight and delivery arrangements,
and packing.  *Therefore, the Thai packers provided many
more selling functions for Canadian sales than they
provided for CEP sales, thus making the Canadian LOT
more advanced than the CEP LOT.*

Prelim. Results, 74 Fed. Reg. at 10,004-05 (emphasis added)

(unchanged in Final Results, 74 Fed. Reg. 47,551, see I & D Mem.

Cmt. 8).[28]

Having found the LOT of Rubicon's third country market NV

comparison sales to be more advanced than the LOT of Rubicon's

CEP sales in the U.S., "because the data available did not form

an appropriate basis for making a [LOT] adjustment but the

---

[28] See also Prelim. Results, 74 Fed. Reg. at 10,005 ("The
Rubicon Group provided evidence on the record of this review
supporting its contention that the selling activities that the
Thai packers performed for Canadian customers were much more
extensive than those performed for U.S. sales to its affiliate
Rubicon Resources.  While sales to Canada consumed a great deal
of the Thai packers' time and resources, the interaction between
the Thai packers and Rubicon Resources appeared to be
perfunctory, consuming very little of the Thai packers' time and
resources." (citing Response of Rubicon Group to the Department's
Supplemental Sections A, B, and C Questionnaire, A-549-822,
ARP 07-08 (Oct. 29, 2008), Admin. R. Pub. Doc. 152)).  Further,
the Department noted that "[t]he record of this review also
contain[ed] information concerning Wales & Co. Universe Ltd.'s
(Wales') [a member of the Rubicon Group] activities with respect
to sales made by the Thai packers to Rubicon Resources.
According to Wales, it had limited communications with Rubicon
Resources on behalf of the Thai packers because the Thai packers
did not communicate directly with Rubicon Resources regarding
U.S. sales made during the POR." Id. (footnote omitted).

Canadian LOT was at a more advanced stage of distribution than the CEP LOT, [Commerce] made a CEP offset to NV in accordance with [19 U.S.C. § 1677b(7)(B)]." I & D Mem. Cmt. 8 at 21.[29]

AHSTAC contests the Department's finding that the Canadian LOT was at a more advanced stage of distribution than the CEP LOT (AHSTAC's Br. 14-20), see also I & D Mem. Cmt. 8 at 22, arguing that the Department's grant of a CEP offset to Rubicon's NV in this review was both contrary to established practice and unsupported by substantial evidence on the record of the third review.[30]

> B.    Commerce Did Not Act Contrary to Precedent In Granting a CEP Offset to Rubicon's NV in This Review.

AHSTAC first argues that, "[a]lthough Commerce makes determinations in a review based on the record developed in that proceeding, the agency has an established practice of giving weight to previous determinations made in prior proceedings

---

[29] In accordance with 19 U.S.C. § 1677b(a)(7)(B), Commerce calculated the CEP offset to be "the lesser of: (1) the [ISEs] incurred on the third-country sales, or (2) the [ISEs] deducted from the starting price in calculating the CEP [i.e., expenses for which a deduction is made under section 1677a(d)(1)(D)]." Prelim. Results, 74 Fed. Reg. at 10,005 (unchanged in final results).

[30] AHSTAC does not contest the Department's finding that the data available on this record do not provide an appropriate basis to calculate an LOT adjustment under 19 U.S.C. § 1677b(a)(7)(A). (See generally AHSTAC's Br.)

regarding whether a CEP offset is appropriate,"[31] and that the

Department should have therefore given more weight to its

_____

[31] (AHSTAC's Br. 16; see also id. at 16-17 (quoting Issues &
Decision Mem., A-351-840, ARP 07-08 (Aug. 11, 2009), available at
http://ia.ita.doc.gov/frn/summary/BRAZIL/E9-19223-1.pdf (last
visited Sept. 1, 2010) (incorporated by reference in Certain
Orange Juice from Brazil, 74 Fed. Reg. 40,167, 40,167 (Dep't
Commerce Aug. 11, 2009) (final results of AD duty administrative
review)) Cmt. 2 at 10 ("There is no meaningful change in the
selling functions provided by [the respondent] in both the home
market and the U.S. market between the last review and the
current review . . . ."); Issues & Decision Mem., A-351-840, ARP
05-07 (Aug. 5, 2008), available at
http://ia.ita.doc.gov/frn/summary/BRAZIL/E8-18479-1.pdf (last
visited Sept. 1, 2010) (incorporated by reference in Certain
Orange Juice from Brazil, 73 Fed. Reg. 46,584, 46,585 (Dep't
Commerce Aug. 11, 2008) (final results and partial rescission of
AD duty administrative review)) Cmt. 5 at 18 ("Our analysis in
this administrative review is consistent with the analysis
performed in the LTFV investigation, and we disagree with [the
respondent] that the evidence on the record here is any more
probative than it was in the past."); Certain Orange Juice from
Brazil, 73 Fed. Reg. 18,773, 18,776 (Dep't Commerce Apr. 7, 2008)
(preliminary results and partial rescission of AD duty
administrative review) (denying CEP offset "because no compelling
evidence exists that [the respondent]'s sales process changed
during the POR of this administrative review"); Issues & Decision
Mem., A-580-834, ARP 04-05 (Jan. 23, 2007), available at
http://ia.ita.doc.gov/frn/summary/KOREA-SOUTH/E7-1462-1.pdf (last
visited Sept. 1, 2010) (incorporated by reference in Stainless
Steel Sheet and Strip in Coils from the Republic of Korea,
72 Fed. Reg. 4,486, 4,489 (Dep't Commerce Jan. 31, 2007) (final
results and rescission of AD duty administrative review in part))
Cmt. [1] at 8-9 (denying CEP offset after granting one in a
previous proceeding where the records in the respective
proceedings were "inherently different"), and citing Issues &
Decision Mem., A-549-822, ARP 06-07 (Aug. 29, 2008), available at
http://ia.ita.doc.gov/frn/summary/THAILAND/E8-20165-1.pdf (last
visited Sept. 1, 2010) (incorporated by reference in Certain
Frozen Warmwater Shrimp from Thailand, 73 Fed. Reg. 50,933,
50,937 (Dep't Commerce Aug. 29, 2008) (final results and final
partial rescission of AD duty administrative review))("2d AR I &
D Mem.") Cmt. 5 at 15).)

determinations in the LTFV investigation underlying this AD order, as well as the second administrative review of this order, where Commerce declined to grant Rubicon a CEP offset. (AHSTAC's Br. 16-17.)

In response, the Department asserts that "Commerce makes determinations based upon the record of the relevant segment of the proceeding, not previous segments, and [that] the record of this review supports Commerce's determination." (Def.'s Br. 12; see also id. at 13 (noting that "the Court has rejected explicitly the contention that denial of a [CEP] offset in an early segment of the proceeding, even if the facts were identical, should control Commerce's decision in a subsequent review" (citing Alloy Piping Prods., Inc. v. United States, No. 08-00027, 2009 WL 983078, at *6 (CIT 2009) ("Even assuming Commerce's determinations at issue are factually identical, as a matter of law a prior administrative determination is not legally binding on other reviews before this court. Thus, the court is not persuaded by Plaintiffs' suggestion to follow the analysis in [a prior review] given that Commerce has demonstrated with substantial evidence, and in accordance with law, that a CEP offset is proper under the facts of the present case." (citing Timken U.S. Corp. v. United States, 434 F.3d 1345, 1352 (Fed. Cir. 2006)))).)

While it is true that "[a]n agency is obligated to follow

precedent," M.M. & P. Mar Advancement, Training, Educ. & Safety Program v. Dep't Commerce, 729 F.2d 748, 755 (Fed. Cir. 1984), "Commerce [nevertheless] has 'discretion to . . . adapt its views and practices to the particular circumstances of the case at hand, so long as the agency's decisions are explained and supported by substantial evidence on the record.'" Nakornthai, __ CIT at __, 587 F. Supp. 2d at 1307 (quoting Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States, __ CIT __, 533 F. Supp. 2d 1290, 1297 (2007)). Accord Alloy Piping, 2009 WL 983078, at *6.

In this case, the Department determined that, unlike the evidence presented to the agency in the LTFV investigation and the second review, "[t]he verified record evidence supports Rubicon's [CEP] offset." (Def.'s Br. 10.) See I & D Mem. Cmt. 8 at 29 ("[B]ased on the facts on the record of the current review, . . . we find it appropriate to [] grant a CEP offset to the Rubicon Group . . . ."). The question before the court is thus whether this determination was adequately explained and supported by substantial evidence on the record.[32] See Nakornthai, __ CIT

---

[32] AHSTAC's contention that "the agency's established practice is to require not only that the respondent seeking a[] CEP offset bear the burden of demonstrating that such an adjustment is warranted, but, where a CEP offset was denied in the past, the respondent has also been required to demonstrate how the record in the current proceeding differs from previous records through 'compelling evidence'" (AHSTAC's Br. 17) is

(continued...)

at __, 587 F. Supp. 2d at 1307-08; <u>Alloy Piping</u>, 2009 WL 983078,
at *6.

AHSTAC essentially argues that Commerce has failed to
adequately distinguish the record evidence of the third review
from that of the second review and LTFV investigation, and that
the agency must accordingly follow its past precedent in those
prior segments. (<u>See</u> AHSTAC's Br. 17-18.)  The court disagrees.

In the LTFV investigation underlying this AD duty order, the
Department explained that, to show entitlement to a CEP offset,
"[a] respondent must first demonstrate that substantial
differences in selling functions exist between the third country
[NV] and CEP [LOTs]." Issues & Decision Mem., A-549-822,
Investigation (Dec. 23, 2004), <u>available at</u>
http://ia.ita.doc.gov/frn/summary/thailand/04-28171-1.pdf (last
visited Sept. 1, 2010) (incorporated by reference in <u>Certain</u>
<u>Frozen and Canned Warmwater Shrimp from Thailand</u>, 69 Fed.
Reg. 76,918, 76,919 (Dep't Commerce Dec. 23, 2004) (notice of
final determination of sales at LTFV and negative final
determination of critical circumstances)) ("<u>LTFV I & D Mem.</u>")
Cmt. 5 at 21.  Commerce then determined, on the record of that
segment, that a CEP offset for Rubicon was not warranted, because

---

[32](...continued)
simply a reformulation of the well-established rule that agencies
must treat similar situations similarly or else explain their
failure to do so. <u>E.g.</u>, <u>M.M. & P. Mar</u>, 729 F.2d at 755.

it found that Rubicon "performed essentially the same selling functions for its third country/EP transactions and for its sales to the U.S. affiliate." Id. at 20.

Similarly, in the second administrative review of the resulting AD duty order (the next time that the Rubicon Group was selected for individual examination[33]) Commerce again "analyzed the selling functions that the Rubicon Group performed through each [channel of] distribution [] for sales to Canada, as well as the selling functions it performed to sell to its U.S. EP customers and to Rubicon Resources," 2d AR I & D Mem. Cmt. 5 at 12, and determined that a CEP offset for Rubicon was not warranted on the record of that review, because the Department found that "the Rubicon Group performed essentially the same selling functions for its third country/EP transactions and for its sales to the U.S. affiliate." Id. at 15 (citation omitted).[34] With regard to the evidence on the record before the agency in

---

[33] The Rubicon Group was not selected for individual examination in the first administrative review of this AD duty order. See Certain Frozen Warmwater Shrimp from Thailand, 72 Fed. Reg. 10,669, 10,670 (Dep't Commerce Mar. 9, 2007) (preliminary results and partial rescission of AD duty administrative review).

[34] See also id. (noting that "[i]n order for the Department to grant a CEP offset, the respondent must first demonstrate that substantial differences in selling functions exist between the third country and CEP LOTs, in accordance with 19 C.F.R. § 351.412(c)(2)." (citing Roller Chain, Other Than Bicycle, from Japan, 61 Fed. Reg. 64,322, 64,326 (Dep't Commerce Dec. 4, 1996) (final results of AD duty administrative review, and determination not to revoke in part))).

the second review, the Department noted that, "although the Rubicon Group provided evidence of Rubicon Resources' interaction with its U.S. customers in this review, it provided very little detail concerning the activities performed by the Thai packers for sales to Rubicon Resources and no evidence of these activities." Id. at 16.  Commerce accordingly concluded that, because, "based on information gathered in the LTFV investigation, at a minimum, the Thai packers regularly provide[d] sales forecasting in the form of shipment schedules to Rubicon Resources," id., and because Rubicon had "neither argued nor provided evidence that this activity was no longer performed by the Thai packers during the time period covered by this review," id., "substantial differences in selling activities" did not exist between Rubicon's Canadian sales and its sales to its U.S. affiliate. Id. (noting that "the standard articulated in the regulations [] requires the Department to find 'substantial differences in selling activities' before determining that there is a difference in the stage of marketing" (quoting 19 C.F.R. § 351.412(c)(2))).

The third review, however, was different.  In the third review – the subject of this action – Commerce determined that Rubicon had provided sufficient verified evidence that its selling functions with respect to sales to its U.S. affiliate were at a substantially lesser stage of marketing than its

selling functions with regard to its NV sales. I & D Mem. Cmt. 8 at 27. Unlike the LTFV investigation, where Rubicon reported, and Commerce verified, essentially identical sales activities with regard to its Canadian sales as with regard to its sales to its U.S. affiliate,[35] and unlike the second administrative review, where Rubicon "provided very little detail concerning the activities performed by the Thai packers for sales to Rubicon Resources [the U.S. affiliate] and no evidence of these activities,"[36] in the third review, the Department emphasized that Rubicon reported, and Commerce verified, significantly more selling functions for its Canadian sales than for its sales to

_____

[35] Compare Certain Frozen and Canned Warmwater Shrimp from Thailand, 69 Fed. Reg. 47,100, 47,106 (Dep't Commerce Aug. 4, 2004) (notice of preliminary determination of sales at LTFV, postponement of final determination, and negative critical circumstances determination) ("LTFV Prelim. Results") ("[F]or direct sales (i.e., EP [and Canadian] sales), the Rubicon Group reported the following selling functions: sales forecasting/market research, sales promotion/trade shows/ advertising, inventory maintenance, order processing/invoicing, freight and delivery arrangements, and direct sales personnel.") with id. ("For sales to the U.S. affiliate, the Rubicon Group reported the following selling functions: sales promotion/trade shows/advertising, inventory maintenance, order processing/ invoicing, freight and delivery arrangements, and direct sales personnel."). Accordingly, "[a]fter analyzing the selling functions performed for each sales channel, [the Department] [found] that the distinctions in selling functions [were] not material." Id.

[36] 2d AR I & D Mem. Cmt. 5 at 16.

its U.S. affiliate.[37]  Accordingly, relying on the AD statute and the SAA, and explaining that the Department's LOT analysis involves a comparison of the respondent's selling functions for its various channels of distribution, the Department concluded, on the record of the third review, that "the Thai packers provided many more selling functions for Canadian sales than they provided for CEP sales, thus making the Canadian LOT more advanced than the CEP LOT." Prelim. Results, 74 Fed. Reg. at 10,005 (unchanged in Final Results, 74 Fed. Reg. 47,551); see also I & D Mem. Cmt. 8 at 27.

Thus, because "Commerce's analysis includes an explanation of the standards it applied[] and the analysis that led to its conclusion, demonstrating a rational connection between the facts on the record and the conclusions drawn," Alloy Piping, 2009 WL 983078, at *5, the court concludes that Commerce's LOT analysis is supported by substantial evidence, and that the Department has sufficiently distinguished the evidentiary record of the third

---

[37] Compare Prelim. Results, 74 Fed. Reg. at 10,004 ("The Thai packers provided the following selling functions [for Canadian sales]: sales forecasting; market research; sales promotion; advertising; trade shows; inventory maintenance; order input/processing; freight and delivery arrangements; visits, calls and correspondence to customers; development of new packaging and new markets (with customer); packing; and after-sales services . . . .") with id. at 10,004-05 ("The only selling functions that the Thai packers provided for CEP sales were inventory maintenance, order input/processing, freight and delivery arrangements, and packing.").

administrative review from that of the LTFV investigation and the
second administrative review.  Accordingly, the agency's
conclusions from those earlier segments do not serve as precedent
controlling its conclusions in the instant review. See
Nakornthai, __ CIT at __, 587 F. Supp. 2d at 1307.

> C.   *Commerce's Treatment of Rubicon's ISE Ratios as Part of
>      its LOT Analysis Was Reasonable and Supported by
>      Substantial Evidence.*

AHSTAC further contends that Commerce's determination to
grant a CEP offset to Rubicon in this review is both arbitrary
(because contrary to established practice) and not supported by
substantial evidence, because the Department should have given
more weight to Rubicon's reported ISE ratios as part of its LOT
analysis. (See AHSTAC's Br. 18-19.).

First, the court cannot agree with AHSTAC that the
Department has an established practice of giving more weight to a
respondent's ISEs as part of its LOT analysis than it did in this
case.

In support of their argument in this regard, AHSTAC points
to the results of an administrative review of an AD order on hot-
rolled flat-rolled carbon-quality steel from Japan and the LTFV
investigation underlying the AD order now at issue. (AHSTAC's Br.
19.)  In analyzing the LOTs involved in Steel from Japan, the
Department "examined the selling functions" of the respondent,
and noted that "[a] qualitative evaluation of the similarities

and differences in selling functions suggest[ed] that the differences may be substantial." Issues & Decision Mem., A-588-846, ARP 99-00 (Jan. 17, 2002), available at http://ia.ita.doc.gov/frn/summary/japan/02-1268-1.txt (last visited Sept. 1, 2010) (incorporated by reference in Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan, 67 Fed. Reg. 2,408, 2,409 (Dep't Commerce Jan. 17, 2002) (final results of AD duty administrative review)) ("Steel from Japan I & D Mem.") Cmt. 1 at 6.  "As a rule of thumb check on the alleged differences in selling functions, *and subsequent to the Preliminary Results*, [Commerce] calculated the weighted-average [ISEs], by channel of distribution, to help determine the extent of selling activities performed for sales through each channel." Id. (emphasis added).  "*[B]ased on [its] qualitative analysis of selling functions* and the differences in selling expenses, [Commerce] [found] that the differences in [the respondent's] selling activities were, collectively, 'substantial.'" Id. (emphasis added).

In the LTFV investigation underlying this AD duty order, as noted above, the Department "examined the selling activities performed [by Rubicon] for each channel [of distribution]," LTFV Prelim. Results, 69 Fed. Reg. at 47,106, and, "[a]fter analyzing the selling functions performed for each sales channel, [found] that the distinctions in selling functions [were] not material."

Id.  Based on this analysis, the Department concluded that

Rubicon's sales to its U.S. affiliate were at the same LOT as its

sales to its Canadian customers.  Id.  In addition, having found

Rubicon's claim that it performed additional and/or higher

intensity selling activities for sales to Canada than for those

to its U.S. affiliate to have been unsubstantiated by the record

evidence,[38] the Department also "note[d] that the Rubicon Group

has reported a higher level of [ISEs] for sales made to Rubicon

Resources," LTFV Prelim. Results, 69 Fed. Reg. at 47,106,

claiming this fact as additional support for the agency's

_____

    [38] LTFV I & D Mem. Cmt. 5 at 21 ("Regarding the additional
selling function[s] [claimed by Rubicon for its sales to Canada
but not to its U.S. affiliate], [Commerce] disagree[d] that the
Rubicon Group perform[ed] substantial marketing or sales
forecasting activities for sales to its third country customers.
[The Department] did not find at verification that the Rubicon
Group performed significant marketing or forecasting activities
for sales to Canada, nor did the Rubicon Group attempt to
demonstrate at verification the activities or expenses related to
this function.  Therefore, [Commerce] [found] that the Rubicon
Group's claim that it performed this selling function for sales
to Canada but not for CEP sales to be unsubstantiated." (footnote
omitted)); see also id. at 21-22 ("Neither do we agree with the
Rubicon Group's claim that record evidence shows that it
performed certain selling functions at such different levels of
intensity that the Department must conclude that it sold shrimp
at different marketing stages across markets. [. . .]  While we
acknowledge that the selling functions performed for the
unaffiliated customer may have shifted from the Thai packers to
Rubicon Resources with the creation of the joint venture, we
disagree that this argument is persuasive because the focus of
the CEP offset analysis is selling functions performed to sell to
the U.S. affiliate.  When we analyze the functions performed to
sell to Rubicon Resources, we find that the Thai packers perform
substantially the same functions as they do to sell to
unaffiliated customers.").

conclusion that the U.S. LOT for Rubicon's CEP sales was not less advanced than the LOT of its Canadian sales. Id. Nevertheless, the Department emphasized that its decision was based primarily on its analysis of Rubicon's selling functions with respect to sales to Canada and its U.S. affiliate,[39] and that Rubicon's reported ISE ratios simply added support to Commerce's LOT analysis. LTFV I & D Mem. Cmt. 5 at 23.[40]

Contrary to AHSTAC's contentions, therefore, the court finds no basis in either Steel from Japan or the LTFV investigation underlying this AD order to suggest that the Department's practice with regard to its LOT analysis is anything other than, as the agency explained in the instant review, to "focus on [the

---

[39] LTFV I & D Mem. Cmt. 5 at 21 ("[W]e find that the Rubicon Group performed essentially the same selling functions when selling in both Canada and the United States (for both the EP and CEP sales). *Therefore*, we determine that these sales are at the same LOT and no LOT adjustment is warranted." (emphasis added) (quoting LTFV Prelim. Results, 69 Fed. Reg. at 47,106)); see id. at 21 ("We have not altered our decision from that stated in the preliminary determination.").

[40] See id. ("We disagree with the [] implication that we relied heavily on the reported value-based [ISE] ratios in denying the CEP offset. Rather, we considered the ratios in combination with the analysis of selling functions, in order to determine if the ratios substantiated the narrative explanation of selling functions, in accordance with our practice." (citing Brass Sheet and Strip from Canada, 62 Fed. Reg. 16,759, 16,760 (Dep't Commerce Apr. 8, 1997) (final results of AD duty administrative review); Hot-Rolled Steel from Japan Cmt. 1)). See also id. at 24 ("[W]e determined that [Rubicon] is not entitled to [a CEP offset] based on the evidence on this record that there were no significant differences between the selling functions performed for third country and affiliated party U.S. sales.").

respondent's] selling activities." I & D Mem. Cmt. 8 at 27.

Accord Alloy Piping, 2009 WL 983078, at * 5 ("[T]he focus of the

LOT adjustment analysis, which may ultimately lead to a CEP

offset, is on *selling activities* and not on expenses as the

Plaintiffs suggest." (footnote omitted, emphasis in original)

(citing 19 U.S.C. § 1677b(a)(7)(A)(i); 19 C.F.R. § 351.412(c)(2);

SAA at 829; Antidumping Duties; Countervailing Duties, 62 Fed.

Reg. at 27,371))).  Although the agency has in the past used a

respondent's ISE ratios to corroborate its analysis of selling

functions, Steel from Japan I & D Mem. Cmt. 1 at 6; LTFV Prelim.

Results, 69 Fed. Reg. at 47,106, there are numerous subsequent

instances where the Department has not considered a respondent's

selling expenses as part of its LOT analysis at all,[41] and AHSTAC

---

[41] See, e.g., Purified Carboxymethylcellulose from Finland, 74 Fed. Reg. 16,180, 16,184 (Dep't Commerce Apr. 9, 2009) (notice of preliminary results of AD duty administrative review) (unchanged in final results, 74 Fed. Reg. 28,886 (Dep't Commerce June 18, 2009)); Certain Welded Carbon Steel Pipe and Tube from Turkey, 74 Fed. Reg. 6,368, 6,370-71 (Dep't Commerce Feb. 9, 2009) (notice of preliminary results of AD duty administrative review) (unchanged in final results, 74 Fed. Reg. 22,883 (Dep't Commerce May 15, 2009)); Carbon and Certain Alloy Steel Wire Rod from Canada, 73 Fed. Reg. 39,646, 39,649-50 (Dep't Commerce July 10, 2008) (notice of preliminary results of AD duty administrative review) (unchanged in final results, 73 Fed. Reg. 77,005 (Dep't Commerce Dec. 18, 2008) and accompanying Issues & Decision Mem., A-122-840, ARP 06-07 (Dec. 11, 2008), available at http://ia.ita.doc.gov/frn/summary/CANADA/E8-30090-1.pdf (last visited Sept. 1, 2010) Cmt. 1 at 3 ("[N]or do differences in reported [ISEs] for different sales channels necessarily reflect different LOTs.  Rather, pursuant to 19 C.F.R. § 351.412(c)(2), 
(continued...)

has not pointed the court to, and the court is not aware of, any precedent where, rather than corroborating the Department's conclusions with regard to a respondent's selling functions, the respondent's expenses have been used to reverse those conclusions. (See generally AHSTAC's Br.)

Accordingly, the court concludes that Commerce did not act contrary to its established practice by not giving more weight to Rubicon's ISE ratios as part of its LOT analysis in this review.

Second, to the extent that AHSTAC's argument is that the agency's finding with regard to Rubicon's LOTs is unsupported by substantial evidence because the Department should in any case have given more weight to Rubicon's expense ratios, it is not for this Court to re-weigh the evidence or substitute its own

---

[41](...continued)
to determine whether comparison market sales were at a different LOT than sales to the United States, we examine stages in the marketing process and selling functions along the chain of distribution between the producer and the unaffiliated (or arm's length) customers.")). See also Arcelormittal USA Inc. v. United States, No. 06-00085, 2008 WL 2223071, at *11 (upholding grant of CEP offset where "Commerce reasonably relied on the evidence of the selling functions performed by defendant-intervenors' United States affiliates in deciding to grant the companies a CEP offset," and making no mention of selling activities); Alloy Piping, 2009 WL 983078, at *5 ("If Commerce, or this Court, in reviewing an administrative determination, were to narrow the focus of its LOT analysis to selling expenses, it could act contrary to law and cause misleading results.  Expenses do not necessarily translate directly into activities, nor do they capture the intensity of the activities.  Moreover, expenses related to several selling activities may fall under a single expense field.").

judgment for that of the agency. E.g., Chia Far Indus. Factory

Co. v. United States, 28 CIT 1336, 1362, 343 F. Supp. 2d 1344,

1369 (2004).  As the Department explained, the evidence submitted

by Rubicon and verified by Commerce in this review with regard to

Rubicon's selling functions in both the U.S. and Canadian markets

was, unlike the evidence submitted in the LTFV investigation and

the second review, sufficient for the agency to determine that

Rubicon's Canadian sales were at an LOT that was more remote from

the factory than the LOT of its sales to its U.S. affiliate. I &

D Mem. Cmt. 8 at 27.  Accordingly, the court concludes that

Commerce's determination in this regard was supported by

substantial evidence on the record of the third review.  The

Department's conclusion that more weight should not have been

given to Rubicon's ISE ratios as part of Commerce's LOT analysis

is reasonable in light of the record as a whole,[42] and is neither

_____

    [42] The Department explained that, "[i]n this case, a
quantitative analysis [was] inappropriate because it assumes that
the expense data reported by the Rubicon Group are an accurate
depiction of the level of intensity at which the selling
activities are performed," I & D Mem. Cmt. 8 at 28, as well as
because "[s]elling expenses do not translate directly into
selling activities, nor do they always capture the degree to
which the activities are performed." Id.  The Department also
noted that the Rubicon Group had argued before it that "the ISE
ratios reported for the Thai packers' sales to Rubicon Resources
[the U.S. affiliate] [were] inherently overstated," id. at 25,
explaining that "[Rubicon] differentiated between ISEs for direct
sales to unaffiliated customers and ISEs for sales to Rubicon
Resources solely based on the accounts for marketing staff
salaries," id., and that, "[u]sing this approach, . . . the
                                             (continued...)

contrary to the statute, see 19 U.S.C. § 1677b(a)(7)(A)(i), nor

to previous opinions from this Court. See, e.g., Arcelormittal,

2008 WL 2223071, at *11.

The court therefore concludes that Commerce's determination

that Rubicon's sales to its U.S. affiliate were at a lesser LOT

than its sales in the third country comparison market was

supported by substantial evidence on the record as a whole and

was not contrary to law.

III. Commerce's Rejection of Pakfood's Forward Contract Exchange
     Rate Data

A.   Background

After the publication of the Preliminary Results for this

review and after the expiration of the regulatory deadline for

party-initiated factual submissions,[43] Pakfood, on March 13,

---

[42](...continued)
amounts for other ISE accounts also were mostly attributable to
the Thai packers' sales to unaffiliated customers[;] [h]owever,
because there was no systematic or practicable way to attempt to
allocate each ISE account between sales to unaffiliated customers
and sales to Rubicon Resources, the Rubicon Group did not do so."
Id.  Under these circumstances, and in light of the substantial
evidence, discussed above, supporting Commerce's determinations
regarding the differences in Rubicon's selling functions in the
U.S. and Canada, the court concludes that it was reasonable for
the Department to give less weight to Rubicon's reported ISE
ratios than to the verified evidence on the record regarding
Rubicon's actual selling functions in both markets.

[43] Under 19 C.F.R. § 351.301(b)(2), the deadline for
party-initiated submissions is 140 days after the last day of the
anniversary month – i.e., "the calendar month in which the
anniversary of the date of publication of an [AD duty] order
                                                  (continued...)

2009, and for the first time in this proceeding, requested permission to submit to Commerce its U.S. sales data reflecting the exchange rates in its forward contracts. Letter from Trade Pacific PLLC, A-549-822, ARP 07-08 (Mar. 13, 2009), Admin. R. Pub. Doc. 226 ("First Request to Supp."). Although the statute and Department's regulations explicitly provide that if "a currency transaction on forward markets is directly linked to an export sale under consideration, [Commerce will use] the exchange rate specified . . . to convert the foreign currency," 19 U.S.C. § 1677b-1(a); 19 C.F.R. § 351.415(b), Pakfood argued that, because the department had not previously requested data on contractual exchange rates, "the need to provide this information thus was not previously evident." First Request to Supp. at 2.

Commerce denied Pakfood's request, Letter to Trade Pacific PLLC, A-549-822, ARP 07-08 (Mar. 16, 2009), Admin. R. Pub. Doc. 228, ("First Denial of Request to Supp."), explaining that:

> [t]o properly consider this new information in its margin calculations, the Department would require significant additional time to analyze the data, request clarification or supplemental information . . ., and allow for comments . . . . Given that [Pakfood's] request was made at a late stage . . . the

---

[43](...continued)
. . . occurs." Ass'n of Am. Sch. Paper Suppliers v. United States, __ CIT __, 683 F. Supp. 2d 1317, 1321 (2010). Accordingly, because the anniversary month in this case was February 2008, see Notice of Inititation, 73 Fed. Reg. at 18,754, the deadline for party-initiated factual submissions in this review was July 18, 2008.

> Department would not be able to properly analyze the
> data within the statutory timeframe . . . .

Id. Upon Pakfood's request to reconsider this decision, Letter

from Trade Pacific PLLC, A-549-822, ARP 07-08 (Apr. 21, 2009),

Admin. R. Pub. Doc. 248, the Department reiterated its reasons

for denying Pakfood's request. See Letter to Trade Pacific PLLC,

A-549-822, ARP 07-08 (Apr. 22, 2009), Admin. R. Pub. Doc. 250

("2d Denial of Request to Supp.").

Following this exchange of letters, and in response to

Commerce's Preliminary Results, which did not incorporate the

exchange rates from Pakfood's forward contracts, see Prelim.

Results, 74 Fed. Reg. at 10,007, Pakfood submitted a case brief

that did not address the contractual exchange rates issue. See

generally Letter from Trade Pacific PLLC, A-549-822, ARP 07-08

(May 29, 2009), Admin. R. Pub. Doc. 261.  As Pakfood did not

address this issue in its case brief, Commerce did not comment on

the issue in either the Final Results or the Issues and Decision

Memorandum. See generally Final Results, 74 Fed. Reg. 47,551; I &

D Mem.

> B.    *Pakfood Failed to Exhaust its Administrative Remedies*
>       *and Therefore Failed to Preserve This Issue for*
>       *Judicial Review.*

Commerce argues that Pakfood failed to exhaust its

administrative remedies regarding its exchange rate claim and

that Pakfood is therefore precluded from bringing this claim

before the court. (Def.'s Br. 15-18.)  Pakfood responds that its

failure to exhaust its administrative remedies should be excused

both because pressing its argument in its case brief at the

administrative level would have been futile and because Commerce

fully considered the exchange rate issue in this segment. (See

Resp'ts' Joint Reply Br. ("Resp't Pls.' Reply") 1-4.)

The court agrees with the Department that Pakfood's failure

to exhaust its administrative remedies on this issue precludes

the issue's review at this time.  "[A]bsent a strong contrary

reason, the court should insist that parties exhaust their

remedies before the pertinent administrative agencies." Corus

Staal BV v. United States 502 F.3d 1370, 1379 (Fed. Cir. 2007).[44]

---

[44] The preference for exhaustion (1) prevents the "frequent
and deliberate flouting of administrative processes which could
weaken the effectiveness of an agency," Randolph-Sheppard Vendors
of Am. v. Weinberger, 795 F.2d 90, 105 (D.C. Cir. 1986) (internal
quotation and alteration marks and citation omitted); see also
Luoyang Bearing Factory v. United States, 26 CIT 1156, 1186,
240 F. Supp. 2d 1268, 1297 (2002); (2) protects the autonomy and
efficiency of agency decisionmaking within the agency's sphere of
expertise, Sandvik Steel Co. v. United States, 164 F.3d 596, 600
(Fed. Cir. 1998); (3) aids judicial review by encouraging the
development of factual issues pertinent to the legal dispute,
Carpenter Tech. Corp. v. United States, 30 CIT 1373, 1375, 452
F. Supp. 2d 1344, 1346-1347 (2006); and (4) promotes judicial
economy by ensuring that the court does not duplicate the
agency's fact-finding function and providing the agency with the
chance to correct its errors, potentially obviating the need for
judicial review, Sandvik Steel, 164 F.3d at 600. See Carpenter
Tech., 30 CIT at 1597, 464 F. Supp. 2d at 1346 ("[E]xhaustion is
generally appropriate in the [AD] context because it allows the
agency to apply its expertise, rectify administrative mistakes,
and compile a record adequate for judicial review – advancing the
(continued...)

Generally, the "prescribed remedy" for a party in disagreement with Commerce's Preliminary Results is to file a case brief, Ta Chen Stainless Steel Pipe, Ltd. v. United States, 28 CIT 627, __, 342 F. Supp. 2d 1191, 1205 (2004), and that "case brief must present *all* arguments that *continue* in the submitter's view to be relevant to [Commerce]'s final determination or final results . . . ." 19 C.F.R. § 351.309(c)(2)(emphasis added).

Thus, in general, under the Department's regulations, requiring the inclusion within the case brief of all issues which remain in controversy is "appropriate" in actions challenging the results of AD duty order administrative reviews. See 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."). See also Ad Hoc Shrimp Trade Action Comm. v. United States, __ CIT __, 675 F. Supp. 2d 1287, 1300 (2009) ("It is 'appropriate' for litigants challenging [AD] actions to have exhausted their administrative remedies by including all arguments in their case briefs submitted to Commerce." (quoting 28 U.S.C. § 2637(d))); id. (noting that, even where a party has previously raised an issue with the agency, usually "[t]he failure to include an argument in a case brief is a failure to

---

[44](...continued)
twin purposes of protecting administrative agency authority and promoting judicial efficiency." (citation omitted)).

exhaust administrative remedies with respect to that argument because it deprives Commerce of an opportunity to consider the matter, make its ruling, and state the reasons for its action" (internal quotation and alteration marks and citation omitted)).

In this case, Pakfood does not contest that it omitted its request that Commerce use contractual exchange rates from its case brief. (Mem. of Points & Auth. in Supp. of Mot. by [the Resp't Pls.] for J. Upon the Agency R. ("Resp't Pls.' Br.") 13 n.6.) Nor does Pakfood contest that this omission constitutes a failure to exhaust its administrative remedies. (Id. ("Pakfood did not present this argument in its case brief before the agency, and therefore did not exhaust its administrative remedies." (citing 28 U.S.C. § 2637(d); 19 C.F.R. § 351.309(c)(2))).)

It is true that a party's failure to exhaust its administrative remedies should not preclude judicial review of its claims where the benefits of exhaustion are inapplicable or outweighed by other concerns, Timken Co. v. United States, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986) (quoting Hormel v. Helvering, 312 U.S. 552, 558 (1941) ("[The exhaustion doctrine] should not be applied where the obvious result would be a plain miscarriage of justice.")). Moreover, this Court has recognized

certain exceptions to the requirement.[45]  For example, Pakfood

correctly notes that the court has waived the exhaustion

requirement where it would have been futile for the party to

raise its argument at the administrative level, as well as where

the record indicates that - either as a result of other parties'

arguments or the agency's decision-making process - the agency in

fact thoroughly considered the issue in question. (See Resp't

Pls.' Reply 2.) See, e.g., Asociacion Colombiana de Exportadores

de Flores v. United States, 916 F.2d 1571, 1575 (Fed. Cir. 1990)

(allowing waiver of exhaustion requirement on basis of futility);

Valley Fresh Seafood, Inc. v. United States, No. 06-00132,

2007 WL 4380137, at *5 (CIT Dec. 17, 2007) (waiver of exhaustion

requirement on ground that agency fully considered the issue)

(citing Holmes Prods. Corp. v. United States, 16 CIT 1101, 1104

(1992)).

As the court will explain, however, neither of these

exceptions is applicable here.[46]

    *1.   The Futility Exception to the Exhaustion*

---

[45] This Court is "authorized to determine proper exceptions
to the doctrine of exhaustion." Luoyang Bearing, 26 CIT at 1186
n.26, 240 F. Supp. 2d at 1297 n.26 (citation omitted).  For a
list of previously accepted exceptions to this Court's exhaustion
requirement, see, e.g., Ta Chen, 28 CIT at 645 n.18, 342 F. Supp.
2d at 1206 n.18.

[46] Pakfood does not contend that any additional exceptions
are applicable to the case at bar. (See generally Resp't Pls.'
Reply 1-4.)

*Requirement is Not Applicable Here.*

To show that an argument would be futile, "a party must demonstrate that it would be required to go through obviously useless motions in order to preserve its rights." Mittal Steel, 548 F.3d at 1384 (internal quotation and alteration marks and citation omitted).  This exception applies in circumstances where, for example, an agency is unable to provide an appropriate remedy, PPG Indus., Inc. v. United States, 14 CIT 522, 542, 746 F. Supp. 119, 137 (1990) (futility applies where "the agency has no power to provide the remedy sought, or where the remedy would be manifestly inadequate" (citations omitted)), or where "an agency has articulated a very clear position on the issue which it has demonstrated it would be unwilling to reconsider," Randolph-Sheppard, 795 F.2d at 105.  In the latter case, however, the agency's commitment to its position must be so strong as to render requiring a party to raise the issue with the agency "inequitable and an insistence of a useless formality," Luoyang Bearing, 26 CIT at 1186 n.26 (internal quotation marks and citation omitted); PPG Indus., 14 CIT at 542, 746 F. Supp. at 137 (futility requires that exhaustion be a "clearly useless act[]" (internal quotation marks and citation omitted)).

Pakfood argues that it would have been futile to press its exchange rate issue in its case brief because Commerce had dismissed the issue at an earlier stage, explaining that to do so

would have caused delays. (Resp't Pls.' Br. 13 n.6.)  But the mere fact that Commerce rejected an argument at an earlier stage of an administrative proceeding does not, without more, suffice to render a party's continued adherence to such argument an exercise in futility. See PPG Indus., 14 CIT at 543, 746 F. Supp. at 137 ("[T]hat a party to an administrative proceeding finds an argument may lack merit, or had failed to prevail in a prior proceeding based on different facts, does not, without more, rise to the level of futility . . . .").  Even where it is likely that Commerce would have rejected a party's arguments without changing course, "it would still [be] preferable, for purposes of administrative regularity and judicial efficiency, for [the party] to make its arguments in its case brief and for Commerce to give its full and final administrative response in the final results." Corus Staal, 502 F.3d at 1380.  By including arguments in its case brief, even arguments Commerce has repeatedly dismissed, a party ensures the full development of a factual record that facilitates judicial review. See, e.g., Carpenter Tech., 30 CIT at 1375-76, 452 F. Supp. 2d at 1346-47.

In this case, Pakfood's communications with Commerce do not justify Pakfood's conclusion that pressing its exchange rate issue in its case brief would have been futile.  Commerce did not demonstrate a complete unwillingness to reconsider its use of market exchange rates, and no statute or regulation obligated

Commerce to refuse Pakfood's requests.  To the contrary, both the statute and Commerce's regulations indicated that the Department favored the use of timely-established contractual exchange rates. See 19 U.S.C. § 1677b-1(a); 19 C.F.R. § 351.415(b).[47]  Had Pakfood pressed this issue in its case brief, Commerce would have been put on notice that Pakfood still considered the issue relevant and would have had an opportunity to fully consider and explain its exchange rate choices.  In these circumstances, requiring exhaustion of Pakfood's administrative remedies is not "inequitable and an insistence of a useless formality." Luoyang Bearing, 26 CIT at 1186 n.26, 240 F. Supp. 2d at 1297 n.26 (internal quotation marks and citation omitted).

Accordingly, in this case, because Pakfood's omission of the exchange rate claim from its case brief denied Commerce the opportunity to fully consider the issue, thus failing to establish an adequate record for judicial review,[48] the court

---

[47] See also Certain Frozen Warmwater Shrimp from India, 74 Fed. Reg. 9,991, 9,998 (Dep't Commerce Mar. 9, 2009) (preliminary results and preliminary partial rescission of AD duty administrative review) (incorporating exchange rates from respondents' forward exchange contracts and citing 19 C.F.R. § 351.415(b)).

[48] As mentioned, because Pakfood omitted the exchange rates issue from its case brief, Commerce did not address the issue in its final results or the accompanying issues and decision memorandum. See Final Results, 74 Fed. Reg. 47,551; I & D Mem. Instead, the only record evidence of Commerce's reasoning regarding exchange rates is contained in Commerce's two

(continued...)

concludes that the exhaustion requirement should not here be waived for futility.

   *2. The Issue Was Not Fully Considered by Commerce.*

  Pakfood also argues that the court should waive the exhaustion requirement because Commerce actually considered Pakfood's exchange rate issue in the administrative proceeding. (Resp't Pls.' Reply 2 ("Commerce fully considered whether to allow Pakfood to provide its forward contract exchange rate information, and determined not once, but twice that it would not accept the proffered data.").)  However, the sole fact that "objections were previously communicated to Commerce does not circumvent the exhaustion requirement." Ad Hoc Shrimp, __ CIT __, 675 F. Supp. 2d at 1301.  Accordingly, "[r]aising an issue . . . in advance of case brief submission does not dispense with the requirement for case brief inclusion." Id. (citing Carpenter Tech. Corp. v. United States, 30 CIT 1595, 1597-98, 464 F. Supp. 2d 1347, 1349 (2006)).

  Pakfood's exchange rate claim is not discussed in the Final Results or in the accompanying Issues and Decision memorandum. See generally Final Results, 74 Fed. Reg. 47,551; I & D Mem.

---

  [48](...continued)
redundant, one-page rejections of Pakfood's requests to submit exchange rate data. First Denial of Request to Supp., Admin. R. Pub. Doc. 228; 2d Denial of Request to Supp., Admin. R. Pub. Doc. 250.

Compare Valley Fresh, 2007 WL 4380137, at *5 (excusing plaintiff's failure to raise argument in case brief before Commerce where the issue had been given clear consideration in the final results of the administrative review). Because it is reasonable for the Department to have assumed that Pakfood's failure to raise this issue in its case brief meant that Pakfood's objections had been satisfied and that no further resources needed to be devoted to the issue, see Mittal Steel, 548 F.3d at 1384, and because there is in fact no indication in the Final Results and/or the Issues and Decision Memorandum that the agency did indeed fully consider the issue, the court cannot conclude that Pakfood's failure to argue this point in its case brief should be excused on the basis that Commerce nevertheless had full and adequate opportunity to consider the objection in the first instance.

Moreover, although the court may define new exceptions to its exhaustion requirement where no previously established exception applies, Luoyang Bearing, 26 CIT at 1186 n.26, 240 F. Supp. 2d at 1297 n.26, the court declines to do so here. Pakfood has provided no compelling explanation for its failure to exhaust its administrative remedies. It learned of Commerce's exchange rate decision from the Preliminary Results, twice requested alternative treatment, twice received clear negative responses from Commerce, and submitted a case brief that did not

address the issue.  Where a party is aware of an issue that continues to be relevant to the final results and simply decides not to pursue it based on prior interactions with Commerce, "[w]hatever prejudice that may inure to [that party] from this scenario [is] brought on by [the party's] own acts," PPG Indus., 14 CIT at 543, 746 F. Supp. at 137, and therefore does not counsel in favor of waiving any otherwise generally-applicable requirements.

IV.  Commerce's Denial of Interest Income Offset to Rubicon

   *A. Background*

   In response to Commerce's initial questionnaire, the Rubicon Group proposed to offset the financial expenses of two of its affiliates - CSF and PTN - with interest income from certain deposits CSF and PTN placed in financial institutions.[49]  While Rubicon classified these twelve-month term deposits as *non-current assets*, it noted that the deposits were "maintained by the respective financial institutions as guarantees on [the affiliates'] revolving line[s] of credit," Rubicon's Resp. to Supp. Sec. D Quest. 15, and were "required by [the afiliates']

---

   [49] (Resp't Pls.' Br. 6 (citing Letter from White & Case LLP, A-549-822, ARP 07-08 (Jan. 27, 2009), Admin. R. Con. Doc. 43 [Admin. R. Pub. Doc. 187] ("Rubicon's Resp. to Supp. Sec. D Quest.") 15-16 & Exhs. 2d Supp. D-6 (itemizing interest income reported as offset to financial expenses by CSF) & 2d Supp. D-7 (itemizing interest income reported by PTN)).) See also I & D Mem. Cmt. 7 at 20.

banks to secure their respective lines of credit." Id. at 16.
Rubicon explained that the lines of credit were "necessary for
the general day-to-day operations of the compan[ies]," id., and
that the supporting funds were "not deposited for investing
purposes." Id. at 15.  Rubicon argued that, because Commerce had
established a "policy of offsetting interest expenses with income
associated with the general operations of the company and not
related to investing activities," id., the interest income from
these deposits should be offset against its affiliates' financial
expenses. Id. at 15-16.

The Department confirmed Rubicon's explanation that these
deposits were required as a condition for obtaining credit, but
did not offset CSF and PTNs' financial expenses with interest
from the twelve-month deposits. I & D Mem. Cmt. 7 at 20 (noting
that "it is the Department's practice to allow a respondent to
offset financial expenses with short-term interest income
generated from a company's current assets and working capital
accounts").  Commerce explained that, as the deposits "were
appropriately classified as non-current assets in the Rubicon
Group companies' financial statements," id., the Department
"[did] not consider these compensating balances to be liquid
working capital reserves which would be readily available for the
companies to meet their daily cash requirements . . . ." Id.

Rubicon argues that Commerce acted unlawfully in rejecting the request to offset CSF and PTN's financial expenses with the interest income earned on these deposits.[50]  Rubicon contends that Commerce has established a practice of offsetting all interest income demonstrably related to the general operations of a respondent, even if the interest income derives from a long-term asset, and argues that the Department acted arbitrarily by failing to follow this practice in this case. (Resp't Pls.' Br. 17 (arguing that it is Commerce's practice to allow offsets on interest income from long-term assets "if there is a showing that the interest income is related to the general operations of the firm"(internal quotation marks omitted) (quoting Hyundai Elec. Indus. Co. v. United States, 28 CIT 517, 539, 342 F. Supp. 2d 1141, 1161 (2004))); Rubicon's Resp. to Supp. Sec. D Quest. 15 (arguing that an offset in this case would be consistent with

---

[50] The AD statute requires Commerce to incorporate into its calculations of cost of production and constructed value for foreign like products the respondent's "general" and "administrative expenses," "based on actual data pertaining to production and sales of the foreign like product" for cost of production, and "in connection with the production and sale of a foreign like product, in the ordinary course of trade" for constructed value. 19 U.S.C. § 1677b(b)(3)(B) (cost of production); id. (e)(2)(A) (constructed value). The parties agree that Commerce has consistently construed this statute to permit respondents to offset their financial expenses with interest income from short-term assets related to a company's general operations, but disagree as to the nature of Commerce's practice regarding long-term interest bearing accounts. (Compare Def.'s Br. 24 with Resp't Pls.' Reply 6-7.)

Commerce's "policy of offsetting interest expenses with income associated with the general operations of the company and not related to investing activities").

The Department denies Rubicon's characterization of its practice, and argues that its practice is to offset financial expenses solely with short-term interest income from a company's current assets and working capital accounts. (Def.'s Br. 24-25 (arguing that Commerce looks to "'the underlying interest-bearing asset that generated the income'" and grants an offset only where the asset is a current operating expense (quoting Issues & Decision Mem., A-331-802, ARP 06-07 (July 3, 2008), available at http://ia.ita.doc.gov/frn/summary/ECUADOR/E8-15830-1.pdf (last visited Sept. 1, 2010) (incorporated by reference in Certain Frozen Warmwater Shrimp from Ecuador, 73 Fed. Reg. 39,945, 39,946 (Dep't Commerce July 11, 2008) (final results and partial rescission of AD duty administrative review)) ("Shrimp from Ecuador I & D Mem.") Cmt. 3 at 7)).) See also I & D Mem. Cmt. 7 at 20 ("[I]t is the Department's practice to allow a respondent to offset financial expenses with short-term interest income generated from a company's current assets and working capital accounts." (citing Chlorinated Isocyanurates from Spain, 70 Fed. Reg. 24,506 (Dep't Commerce May 10, 2005) (notice of final determination of sales at LTFV) and accompanying Issues & Decision Mem. Cmt. 10 ("Isocyanurates from Spain I & D Mem.");

<u>Certain Frozen Warmwater Shrimp from Brazil</u>, 73 Fed. Reg. 39,940

(Dep't Commerce July 11, 2008) (final results and partial

rescission of AD duty administrative review))).

> B.    *Rubicon Has Not Established that Commerce Followed a*
> *Contrary Practice in Similar Circumstances, and the*
> *Department's Disallowance of Rubicon's Long-Term*
> *Interest Income Offset Was Supported by Substantial*
> *Evidence.*

First, regardless of the nature of Commerce's practice with

respect to the grant or denial of interest income offsets in the

past,[51] at the time of the instant review, Commerce had clearly

_____

[51] In support of their contention that Commerce has an
established practice of offsetting financial expenses by interest
income from long-term assets where it is shown that such income
relates to the general operations of the firm, Respondent
Plaintiffs cite to <u>Dynamic Random Access Memory Semiconductors of
One Megabit or Above from the Republic of Korea</u>, 64 Fed. Reg.
69,694, 69,707 (Dep't Commerce Dec. 14, 1999) (final results of
AD duty administrative review and determination not to revoke the
order in part) ("<u>DRAMS</u>") (granting offset for interest income
earned on long-term deposits because the deposits were "an
integral part of certain loans" and were "directly related to
specific loans," but denying offset for severance deposits
maintained with insurance companies to finance current severance
and retirement payments, because these deposits were "only held
by [the respondent] as restricted deposits to allow [the
respondent] to claim a tax deduction"), and <u>Hyundai Elecs. Indus.
Co. v. United States</u>, 28 CIT 517, 539-40, 342 F. Supp. 2d 1141,
1161-1162 (2004) (affirming "Commerce's decision not to treat
income interest generated from severance deposits as an offset to
Hyundai's interest expense"). (Resp't Pls.' Br. 17-19.)
    <u>DRAMS</u> was decided more than a decade ago and appears
inconsistent with the Department's subsequent practice of
requiring that income interest be generated from current assets
and working capital accounts prior to granting an offset. <u>See
infra</u> note 52. <u>See also</u> Issues & Decision Mem., A-549-821, ARP
07-08 (Dec. 7, 2009), <u>available at</u>
http://ia.ita.doc.gov/frn/summary/thailand/E9-29597-1.pdf (last
                                                      (continued...)

established a practice of allowing income expense offsets solely

for short-term income from current assets and working capital

accounts.[52]  As early as 2005,[53] and as late as just eight months

---

[51](...continued)
visited Sept. 1, 2010) (incorporated by reference in <u>Polyethylene Retail Carrier Bags from Thailand</u>, 74 Fed. Reg. 65,751, 65,751 (Dep't Commerce Dec. 11, 2009) (final results of AD duty administrative review)) Cmt. 4 at 9 ("We do not consider our decision in [] <u>DRAMS</u> to be consistent with our normal practice of only permitting an offset for short-term interest income generated from a company's current assets and working capital accounts.").

    Although, in <u>Hyandai</u>, the court affirmed Commerce's determination in <u>DRAMS</u> with regard to interest income generated from deposits used to make severance payments, the agency's decision regarding interest income earned on long-term deposits was neither challenged by the plaintiff nor revisited by the court. <u>See</u> 28 CIT at 539-40, 342 F. Supp. 2d at 1161-62. Further, in discussing the sole issue with regard to interest income raised in that case – whether interest income generated from deposits used to make severance payments should have been used to offset the respondent's expenses, <u>id.</u> – the <u>Hyuandai</u> court relied solely on <u>Timken Co. v. United States</u>, 18 CIT 1, 852 F. Supp. 1040 (1994), <u>NTN Bearing Corp. v. United States</u>, 19 CIT 1221, 905 F. Supp. 1083 (1995), and <u>Gulf States Tube Div. of Quanex Corp. v. United States</u>, 21 CIT 1013, 981 F. Supp. 630 (1997).  <u>Timken</u> and <u>NTN</u> presented challenges to Commerce's treatment of a respondent's *short-term* interest income, and are accordingly inapposite to the Respondent Plaintiffs' argument, <u>Timken</u>, 18 CIT at 9, 852 F. Supp. at 1048; <u>NTN</u>, 19 CIT at 1237, 905 F. Supp. at 1097, whereas <u>Gulf States</u> explicitly rejected the plaintiff's argument that "long-term interest income must also be taken into account in calculating a respondent's net interest expense." 21 CIT at 1038, 981 F. Supp. at 651.

    Accordingly, <u>DRAMS</u> has been superceded by subsequent practice and <u>Hyuandai</u> is inapposite to the Respondent Plaintiffs' claim.

    [52] <u>See, e.g.</u>, Issues & Decision Mem., A-351-806, ARP 03-04 (Feb. 3, 2006), <u>available at</u> http://ia.ita.doc.gov/frn/summary/BRAZIL/E6-1987-1.pdf (last visited Sept. 1, 2010) (incorporated by reference in <u>Silicon</u>
(continued...)

prior to the publication of its Preliminary Results in this
review, for example, Commerce reiterated that its practice with
regard to the grant or denial of interest income offsets is "to
examine the underlying interest-bearing asset that generated the
income to determine whether or not the interest income is
considered short-term, as opposed to examining liabilities that
may or may not be associated with the interest income earned due
to the fungible nature of money." Shrimp from Ecuador I & D Mem.

---

[52](...continued)
Metal from Brazil, 71 Fed. Reg. 7,517, 7,518 (Feb. 13, 2006)
(notice of final results of AD duty administrative review))
("Silicon Metal from Brazil I & D Mem.") Cmt. 4 at 7 (citing the
Department's practice of excluding "income from long-term
financial assets because such income is related to investing
activities and is not associated with the general operations of
the company," and refusing offsets where the respondent "did not
meet its burden of proof . . . [to] provide documentation
adequate to support the claim that [the] income [in question]
[wa]s short-term in nature . . . ."); Chlorinated Isocyanurates
from Spain I & D Mem. Cmt. 10 at 36 (citing "long-standing
practice [of] offset[ing] interest expense by short-term interest
income generated from a company's working capital," denying
offset because respondent "ha[d] not provided any record evidence
that the financial income received [] was related to short-term
interest bearing accounts," and justifying the practice because
"a company must maintain a working capital reserve to meet its
daily cash requirements" and "companies normally maintain this
working capital reserve in interest bearing accounts."); Issues &
Decision Mem., A-122-850, Investigation (Mar. 4, 2005), available
at http://ia.ita.doc.gov/frn/summary/canada/E5-1029-1.pdf (last
visited Sept. 1, 2010) (incorporated by reference in Live Swine
from Canada, 70 Fed. Reg. 12,181, 12,184 (Dep't Commerce Mar. 11,
2005) (notice of final determination of sales at LTFV)) Cmt. 68
at 133 ("Because the non-operating and other income items in
question are either long-term in nature or relate to investments,
we have excluded [the items from the respondent's offsets].").

[53] See supra note 52.

Cmt. 3 at 7 (explaining that Commerce will "offset (i.e., reduce) financial expenses with short-term interest income earned from a respondent's short term interest-bearing assets," but will not offset "the interest income earned by [the respondent] [that] is the result of a long-term receivable" (citations omitted)). See also Issues & Decision Mem., A-351-838, ARP 06-07 (July 3, 2008), available at http://ia.ita.doc.gov/frn/summary/BRAZIL/E8-15827-1.pdf (last visited Sept. 1, 2010) (incorporated by reference in Frozen Warmwater Shrimp from Brazil, 73 Fed. Reg. at 39,944) ("Shrimp from Brazil I & D Mem.") Cmt. 9 at 17 (citing practice of permitting offsets for "financial expenses with short-term interest income earned from its working capital accounts" and allowing offsets "for only the income that . . . related to short-term" assets).

Moreover, Commerce's stated explanation for its practice – the necessity of maintaining working capital to meet companies'

daily cash requirements[54] – is inconsistent with offsets for long-term accounts that cannot serve daily cash needs.[55]

Accordingly, Commerce has shown that, under its established methodology, the first crucial question in calculating an offset is whether or not the interest income is short-term - i.e. derived from current assets or working capital accounts.  The "burden of proof to substantiate and document [the nature of the accounts] is on the respondent making a claim for [an] offset," Shrimp from Brazil I & D Mem. Cmt. 9 at 17 (citations omitted), and Commerce will not allow an offset where a respondent cannot demonstrate that the interest income in question is short-term in nature. Id.

---

[54] I & D Mem. Cmt. 7 at 20 (explaining that the assets at issue were not offset against Rubicon's financial expenses because they were not "liquid working capital reserves which would be readily available for the companies to meet their daily cash requirements (e.g., payroll, suppliers, etc.)"); Isocyanurates from Spain I & D Mem. Cmt. 10 at 36 (same). (See also Def.'s Br. 24 ("[B]ecause short term assets are used for current company operations, that is, the funds are readily available and used for the company's day-to-day cash requirements, Commerce permits companies to offset the expense of those assets by the interest earned upon them.  Conversely, Commerce does not permit company offsets for interest earned upon long-term assets because [] the funds [] held [in] those accounts are not readily available and are not used for day-to-day cash requirements." (citations omitted)).)

[55] See, e.g., Silicon Metal from Brazil I & D Mem. Cmt. 4 at 7 (disallowing offset to financial expenses for "income [that] has not been demonstrated to be short-term in nature," and explaining that "the Department's practice [is] to exclude income from long-term financial assets because such income . . . is not associated with the general operations of the company").

In this case, the Department found that Rubicon failed to demonstrate that the interest income at issue was short-term in nature, and the agency accordingly concluded that an interest income offset was therefore not warranted. I & D Mem. Cmt. 7 at 20 (explaining that "the interest income at issue is related to certain long-term interest-bearing accounts, which were appropriately classified as non-current assets in the Rubicon Group companies' financial statements"). Because the Department's decision with regard to the Rubicon Group's interest income is consistent with Commerce's prior decisions restricting offsets to short-term income, as well as with the agency's explanations that, because current assets and working capital accounts are necessary to meet a company's daily cash requirements, the Department will grant offsets only where the income in question derives from such assets, the court concludes that Rubicon has failed to establish that Commerce "consistently followed a contrary practice in similar circumstances." Consol. Bearings Co. v. United States, 412 F.3d 1266, 1269 (Fed. Cir. 2005) (internal quotation marks and citation omitted).

Further, Commerce had "such relevant evidence as a reasonable mind might accept as adequate to support [the] conclusion [that Rubicon failed to establish the short-term nature of the assets at issue]," Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (internal quotation marks and citation

omitted); <u>Micron</u>, 117 F.3d at 1393, and could "rationally draw support for [its] finding [that the assets in question were long-term in nature] from the relevant record evidence [indicating that the accounts were non-current assets]." <u>Penrod Drilling Co. v. Johnson</u>, 905 F.2d 84, 87 (5th Cir. 1990). Accordingly, the court concludes that Commerce's findings regarding Rubicon's claimed interest offset were supported by substantial evidence.

## CONCLUSION

For all of the foregoing reasons, this matter is remanded to the agency, for further consideration in accordance with this opinion, solely on the issue of the methodology used to select mandatory respondents in this review. Commerce shall have until November 1, 2010 to complete and file its remand redetermination. Plaintiffs shall have until November 22, 2010 to file comments. Defendant and Defendant-Intervenors shall have until December 6, 2010 to file any reply.

It is **SO ORDERED**.

/s/ Donald C. Pogue
Donald C. Pogue, Judge

Dated:    September 1, 2010
          New York, N.Y.